UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MICHAEL GUTMAN, *on behalf of himself and others similarly situated,*

Plaintiff,

-against-

EMBER TECHNOLOGIES, INC., and GR0.COM LLC d/b/a GR0,

Defendant.

**MEMORANDUM & ORDER**
**25-CV-02436 (NGG) (PCG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Michael Gutman ("Plaintiff") brought this putative class action under Section 227(c)(5) of the Telephone Consumer Protection Act of 1991 (the "TCPA"), 47 U.S.C. § 227(c)(5), against Defendants Ember Technologies, Inc. ("Ember") and gr0.com LLC d/b/a GRO ("gr0" and together with Ember, "Defendants"). In brief, Plaintiff alleges that Defendants violated the TCPA when they sent him a series of "repeated telemarketing text messages" for Ember products in 2024 and 2025 despite Plaintiff's explicit requests not to receive such messages (the "Texts"). (Am. Compl. (Dkt. 15) ¶¶ 1, 36-37.)

Pending before the court are Defendants' fully briefed motions to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] (gr0's Mot. to Dismiss ("gr0 Mot.") (Dkt. 27); Ember's Mot. to Dismiss First Am. Compl. ("Ember Mot.") (Dkt. 30-5); Pl.'s Consolidated Opp'n to Defs.' Mots. ("Pl.'s Opp.") (Dkt. 31); Reply in Supp. of Def. gr0's Mot. to Dismiss First Am. Compl. ("gr0 Reply") (Dkt. 29); Reply in Supp. of Def. Ember's Mot. to Dismiss First Am. Compl. ("Ember Reply")

[1] All subsequent references to Rules are to the Federal Rules of Civil Procedure. When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted and all alterations are adopted.

(Dkt. 32).) For the reasons stated below, the court DENIES Defendants' motions.

## I. BACKGROUND[2]

### A. Factual Background

Plaintiff is an individual resident of Staten Island, New York. (Am. Compl. ¶ 8.) At all relevant times, he used a cellular telephone number ending in 1501 for "personal and residential"—as opposed to "business"—purposes (the "1501 Number"). (*Id.* ¶¶ 32-33.) On July 15, 2021, Plaintiff registered the 1501 Number with the National Do-Not-Call Registry (the "DNC List").[3] (*Id.* ¶ 32.)

Defendant Ember is a Delaware corporation with its principal place of business in California that makes and sells battery-heated coffee mugs, baby bottles, and other products. (*Id.* ¶¶ 3, 9.) Defendant gr0 is a Delaware limited liability company with its principal place of business in California that operates as a marketing agency. (*Id.* ¶¶ 3, 10.)

---

[2] The facts are taken from Plaintiff's Amended Complaint, filed on September 23, 2025—the complaint at issue here. (Am. Compl. (Dkt. 15).) The court summarizes the Amended Complaint's factual allegations and, for the purposes of Defendants' motions, accepts them as true, drawing all reasonable factual inferences in favor of Plaintiff as the non-moving party. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021); *Koch v. Bobcat of N.Y., Inc.*, No. 19-CV-7081 (HG) (TAM), 2025 WL 746023, at *1 (E.D.N.Y. Mar. 7, 2025).

[3] Maintained by the federal government, the National Do-Not-Call Registry allows persons to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. These registrations "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." 47 C.F.R. § 64.1200(c)(2).

In or before February 2024, Ember hired gr0 to run a text message telemarketing campaign to "promote Ember's business and sales promotions and encourage people to purchase Ember's products." (*Id.* ¶¶ 2-3, 22.) Specifically, Defendants entered into a written agreement (the "Agreement") under which gr0 agreed to and did provide various services to Ember, including "advertising and marketing services via text message." (*Id.* ¶ 22; Agreement (Dkt. 30-4).) The Agreement stated, in pertinent part, that gr0 would "unlock revenue" for Ember by "building out" a 12-month "Full Service Email/SMS Marketing" "campaign, automation, and segmentation strategy." (*Id.* ¶ 23 (quoting the Agreement).) The Agreement also stated that the "goal" of the contracted-for text messaging program was to "convert Ember's . . . subscribers into repeat customers." (*Id.* ¶ 24 (internal alteration adopted) (quoting the Agreement).)

Pursuant to the Agreement, gr0 "setup [sic] Ember's text messaging program, authored some or all of the content of each of [the] telemarketing text messages with Ember's approval," and "on behalf of and at the direction of Ember," sent the Texts to Plaintiff. (*Id.* ¶ 30).

On February 8, 2024, despite his DNC List registration, Plaintiff began receiving the Texts. (*Id.* ¶ 34.) The first Text was an image offering a 20% discount on Ember "[m]ugs and accessories," followed by a Text telling Plaintiff to "[s]hop now" on Ember's website. (*Id.*) Plaintiff immediately responded "Stop" to these messages. (*Id.* ¶¶ 34, 36.) In response, Plaintiff received a message stating: "You are unsubscribed from messaging. No more messages will be sent." (*Id.* ¶¶ 34, 36.) Plaintiff received no further Texts for around a year.

On April 25, 2025, the Texts resumed. (*Id.* ¶¶ 34, 37.) That day, Plaintiff received three Texts: (1) a Text consisting of Ember's

contact card;[4] (2) a Text prompting him "to save [the] contact card to be notified about [Ember's] latest deals"; and (3) a Text welcoming Plaintiff "to the Ember family" with a 10% discount code and link at which to "[s]hop now." (*Id.* ¶ 34.)

Ostensibly on April 26, 2025, Plaintiff received a final Text. (*Id.*) That Text notified Plaintiff that his 10% discount code would expire "soon," shared a new discount code so he would not "miss out," and shared a new link at which to "[s]hop now." (*Id.*)

Other than the Text sharing Ember's contact card, each Text that Plaintiff received in April 2025 included the language "Text STOP to opt-out"; two of the Texts also included links to Ember's website. (*Id.*)

Images of the Texts are reproduced below:

[4] A contact card is a feature that allows a user to share his "name, address, phone number" and other information via text messaging. *Add or Edit Your Contact Info and Photo on iPhone*, Apple, https://support.apple.com/guide/iphone/add-your-contact-info-iph18b749db1/ios [https://perma.cc/YDR5-J4PV] (last visited Sep. 14, 2026).







### B. Procedural History

On May 2, 2025, Plaintiff commenced the above-captioned action solely against Ember. (Compl. (Dkt. 1).) On September 23, 2025, following Ember's request for a pre-motion conference on its anticipated motion to dismiss the Complaint, Plaintiff filed the Amended Complaint, the pleading at issue here, which added gr0 as a defendant. (Def. Appl. for Pre-Mot. Conf. (Dkt. 13); Am. Compl.).

Based on the aforementioned factual allegations in the Amended Complaint, Plaintiff alleges that Defendants violated Section 227(c)(5) of the TCPA ("Section 227(c)(5)") and the implementing regulations promulgated by the Federal Communications Commission ("FCC") in two ways: (1) by sending the Texts to the 1501 Number in 2024 and 2025—after he had registered the 1501 Number on the DNC List in 2021, (Am. Compl. ¶¶ 51-66); and (2) by sending the Texts to the 1501 Number in April 2025—after he had responded "Stop" to the Texts in February 2024, (*id.* ¶¶ 67-82).

On January 12 and 14, 2026, Defendants moved to dismiss the Amended Complaint. (gr0 Mot.; Ember Mot.; Pl.'s Opp.; gr0 Reply; Ember Reply.)[5]

## II. LEGAL STANDARDS

### A. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint must contain facts that do more

---

[5] Since the filing of Defendants' motions, Plaintiff has filed three Notices of Supplemental Authority in further support of his Opposition to Defendants' motions to dismiss, (Dkts. 33, 39, 50), and gr0 has filed over ten such notices, (Dkts. 34, 35, 38, 40-42, 46, 48, 49, 51). The Notices of Supplemental Authority point the court to out-of-circuit cases that deal with the issue of whether the Texts are covered by the TCPA. As a result, the Notices do not meaningfully change the analysis below or the court's ultimate conclusion that the Texts are covered by Section 227(c)(5).

than present a "sheer possibility that a defendant has acted unlawfully." *Id.*

In deciding a Rule 12(b)(6) motion to dismiss, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Watson Lab'ys, Inc. v. Forest Lab'ys, Inc.*, 101 F.4th 223, 235 (2d Cir. 2024). However, the court "need not credit conclusory allegations or legal conclusions couched as factual allegations." *State Farm Mut. Ins. Co. v. Ricciardi*, 782 F. Supp. 3d 1, 8 (E.D.N.Y. 2025), *aff'd sub nom. State Farm Mut. Auto. Ins. Co. v. Ricciardi*, No. 25-1423, 2026 WL 1412937 (2d Cir. May 20, 2026).

### B. The TCPA

The TCPA provides in pertinent part:

> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State--
>
> (A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,
>
> (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or
>
> (C) both such actions.
>
> It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices

> and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(c)(5). In other words, Section 227(c)(5) confers a private right of action on any person who has received more than one "telephone call" within any 12-month period by or on behalf of the same entity in violation of Section 227(c)'s implementing regulations. *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 201 (S.D.N.Y. 2024) (quoting 47 U.S.C. § 227(c)(5)).

As relevant here, the FCC exercised its authority under Section 227(c) by promulgating two regulations: (1) Regulation 64.1200(c)(2), codified at 47 C.F.R. § 64.1200(c)(2), which states that "[n]o person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government" (the DNC List); and (2) Regulation 64.1200(d), codified at 47 C.F.R. § 64.1200(d), which states that "[n]o person or entity shall initiate . . . any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." *Cacho*, 739 F. Supp. 3d at 201-02 (first quoting 47 C.F.R. § 64.1200(c)(2); and then quoting 47 C.F.R. § 64.1200(d)). At minimum, the "procedures" described in Regulation 64.1200(d) must include the "recording" and "disclosure" of all do-not-call requests. 47 C.F.R. § 64.1200(d)(3). The requests must be honored within ten business days from receipt. *Id.* The FCC interprets

the language in these regulations to include text messages. *See Targeting and Eliminating Unlawful Text Messages, Implementation of the Tel. Consumer Prot. Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 Fed. Reg. 5098, 5098-99, 5101 (Jan. 26, 2024).

## III. DISCUSSION

Defendants argue that Plaintiff's TCPA claims fail on five separate grounds. First, Defendants both argue that Section 227(c)(5) does not cover Plaintiff's claims because the Texts do not fall under the statutory prohibition on unwanted "telephone calls." (Ember Mot. at 1; gr0 Mot. at 7.) Second, Ember advances four additional grounds for why Plaintiff's claims should be dismissed: (1) that Plaintiff's phone was not "residential"; (2) that the texts were not "solicitations"; (3) that Ember maintained a sufficient DNC List; and (4) and that it cannot be held vicariously liable. (Ember Mot. at 14-24.) Plaintiff opposes each of these assertions. The court addresses them *seriatim*.

### A. Texts Are Calls under the TCPA

Whether Plaintiff's claim can survive this motion to dismiss depends on whether the Texts fall under the term "telephone call" that Section 227(c)(5) contemplates. 47 U.S.C. § 227(c)(5); *see also Wilson v. Better Mortg. Corp.*, 811 F. Supp. 3d 631, 637 (S.D.N.Y. 2025) ("*BMC*") (discussing whether "§ 227(c) of the TCPA applies to text messages"). The court finds "in accord with a growing consensus of case law" that they do. *BMC*, 811 F. Supp. 3d at 637.

Defendants argue that the Texts "are not [covered by] the TCPA," because Section 227(c)(5) addresses only "telephone calls"—as opposed to telephone calls *and* text messages. (Ember Mot. at 1; gr0 Mot. at 7.) They assert that, because the court "must independently interpret statutes" following the Supreme Court's decisions in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369

(2024), and *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025) (discussing independent interpretation in the context of the TCPA), it should find that the plain meaning of "telephone calls" as understood at the time of the TCPA's enactment does not include text messages. (Ember Mot. at 6-7; gr0 Mot. at 9-10.)

Plaintiff opposes this conclusion, arguing that the TCPA's "statutory text and FCC regulations and guidance support the conclusion that text messages *can*" fall under the definition of "telephone call," and that independent analysis of the language actually supports the "conclusion that the receipt of text messages" falls under this definition. (Pl.'s Opp. at 5 (quoting *Hudson v. Palm Beach Tan, Inc.*, No. 1:23-CV-486(WO)(JEP), 2024 WL 4190513, at *6-7 (M.D.N.C. Aug. 12, 2024), *report and recommendation adopted*, No. 1:23-CV-486, 2024 WL 4188310 (M.D.N.C. Sept. 13, 2024)) (emphasis added).) Defendants reply that this argument amounts to "interpretive gymnastics," (gr0 Reply at 5), and that the term "telephone call" could not have been defined at the time of the TCPA's enactment to include text messages. (gr0 Mot. at 8.)

To determine whether "telephone calls" includes texts, the court must "independently determine for itself" "the meaning of the law under ordinary principles of statutory interpretation." *McLaughlin*, 606 U.S. at 155. The "starting point for interpreting a statute is the language of the statute itself." *BMC*, 811 F. Supp. 3d at 637 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987)). This analysis "necessarily begins with the plain meaning of a law's text." *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 156 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 1501 (2026); *see also Wilson v. Easy Spirit, LLC*, No. 3:25-CV-112 (SFR), 2026 WL 884170, at *4 n.3, *5 (D. Conn. Mar. 31, 2026) (conducting its "own independent statutory interpretation analysis" under *McLaughlin* of whether "telephone calls" includes texts under Section 227(c)(5)).

1. Plain Language

The statute does not define the meaning of "telephone call." *See* 47 U.S.C. § 227(c)(5). When, as here, a "word is not defined by statute, [the court will] normally construe it in accord with its ordinary . . . meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). Specifically, the court must use the "ordinary public meaning" of the word "at the time of [the statute's] enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). To ascertain the word's contemporaneous, ordinary meaning, the court may rely on "roughly contemporaneous dictionaries," *id.* at 655; that is, "dictionaries that were available when the statute was enacted," *Nero v. Uphold HQ Inc.*, 688 F. Supp. 3d 134, 140 (S.D.N.Y. 2023).

The TCPA was enacted in 1991. Dictionaries from that time indicate that a "telephone call" had a broad enough definition to include text messages. For example, the 1990 publication of Webster's Ninth New Collegiate Dictionary (published one year before the TCPA's enactment), defines "call" as to "get or try to get into communication by telephone." Webster's Ninth New Collegiate Dictionary 197 (1990). The Random House Webster's College Dictionary, from 1991, defined "call" as to "communicate or try to communicate with by telephone." Random House Webster's College Dictionary 194 (1991). This language is plainly broad enough to include text messages, because text messages are dispatches transmitted between telephones in order to get into communication with the intended recipient. *See BMC*, 811 F. Supp. 3d at 638 (finding it "undisputed that text messages are communications sent by telephone" for this reason). Nor does the use of the full phrase "telephone call" change this analysis. (*Cf.* gr0 Reply at 7-8.) Telephones that are capable of sending and receiving text messages may still send and receive voice calls, and

this has no bearing on whether the "calls" they receive include texts as well.[6]

It is true that text messaging did not yet exist when the TCPA was enacted; "the first text message was sent in late 1992, nearly a year after the TCPA's enactment." *BMC*, 811 F. Supp. 3d at 638. This fact does not change the analysis, though. The court's job is to determine whether the Texts are covered by Section 227(c)(5)'s language. And the language used is more than broad enough to cover the Texts. In fact, for "general" and capacious terms like "call," "the appropriate course is to employ the theory of statutory construction that [these] terms encompass future developments and technological advancements" like text messages. *Lehrman v. Lovo, Inc.*, 790 F. Supp. 3d 348, 381 (S.D.N.Y. 2025). *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 16 (2012) ("[G]eneral terms may embrace later technological innovations."). The plain language of the TCPA allows for this possibility by simply using the word "call," when it could have prescribed more specific language, such as "voice call" or "audio telephone call."

The court is also not persuaded by Defendants' argument that the term "call" must have a "distinct" independent meaning because the term "message" is used elsewhere in the statute. (Ember Mot. at 8; gr0 Mot. at 8.) The use of the phrase telephone "call or message" to define a telephone "solicitation" elsewhere in the TCPA

---

[6] Conversely, gr0's argument that the court's interpretation would subject "any communication transmitted to a phone" to the TCPA, including emails, is unpersuasive. (gr0 Reply at 7.) First, the court here need only decide whether Plaintiff has sufficiently pleaded a violation of the TCPA, and need not address the hypothetical limits of the language posed by gr0. Second, there are clear differences between texts and emails; the former are specifically sent between telephones, as opposed to the latter, which are sent from "device to device" including computers, or cellular telephones, or PDAs. *Joao v. Sleepy Hollow Bank*, 418 F. Supp. 2d 578, 584 (S.D.N.Y. 2006) (subsequent history omitted).

does not mean that the use of the phrase "telephone call" in Section 227(c)(5) and Regulations 64.1200(c)(2) and (d) excludes text messages. Congress "commonly writes federal statutes . . . in such a belt and suspenders manner." *Snyder v. United States*, 603 U.S. 1, 19 (2024). Even if Congress had chosen to include the word "message" in Section 227(c)(5), it has no bearing on whether the definition of "telephone call" is sufficiently broad to encompass text messages, too.

2. Statutory Context

As the next step in its independent analysis, the court looks to the "context of [Section] 227(c)," because "[s]tatutes must be read as a whole, not as a collection of isolated provisions . . . [and c]ourts therefore interpret statutory terms 'in their context and with a view to their place in the overall statutory scheme.'" *BMC*, 811 F. Supp. 3d at 639 (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

Here, the immediately preceding section, Section 227(b), provides helpful context. "Section 227(b) of the TCPA uses the same term as [Section] 227(c): telephone call. And numerous federal courts of appeals have held that [Section] 227(b) applies to text messages, or assumed so without deciding the issue." *Id.* (collecting cases). The Second Circuit itself has also "repeatedly treated [Section] 227(b)'s reference to telephone calls as covering text messages." *Id.* In *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 281 (2d Cir. 2020), *vacated on other grounds*, *La Boom Disco, Inc. v. Duran*, 141 S. Ct. 2509 (2021), the court dealt with an alleged violation of the TCPA for use of an automatic telephone dialing system ("ATDS"), which Section 225(b) prohibits. There, it wrote specifically that it "is undisputed that a text message to a cellular telephone qualifies as a call within the compass of the TCPA" and thus found a defendant liable for the "use of ATDSs to produce unwanted phone calls or text messages." *Id.* at 280 n.4, 281-82, 290. In *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019), it likewise found liability because it found that "text

messages . . . present the same 'nuisance and privacy invasion' envisioned by Congress when it enacted the TCPA."[7] The Supreme Court discussed the issue similarly in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016), *as revised* (Feb. 9, 2016), where it assumed that a "text message to a cellular telephone . . . qualifies as a 'call' within the [definition] of" Section 227(b). *See also Facebook, Inc. v. Duguid*, 592 U.S. 395, 400 n.2 (2021) ("assum[ing] that" "the TCPA's prohibition also extends to sending unsolicited text messages").

That an identical term in an immediately preceding subsection of the TCPA has been interpreted by both the Second Circuit and Supreme Court to include text messages is persuasive evidence in the court's independent analysis that text messages should be included in the definition of the term in Section 227(c), too. Indeed, "identical words used in different parts of the same statute are generally presumed to have the same meaning." *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 372-73 (2d Cir. 2022) (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)); *see*

[7] The court does not consider congressional purpose to be dispositive, because when "the meaning of the statute's terms is plain, our job is at an end." *Bostock*, 590 U.S. at 674. But the court notes nonetheless that Congress's purpose when passing the TCPA as discussed in *Melito* clearly supports its conclusion, too. *See Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 207 (S.D.N.Y. 2024) ("When construing a statute, a court must interpret the relevant words not in a vacuum, but with reference to the statutory purpose."). The 1991 House Report on the Act, for example, broadly states that its goal was to "protect residential telephone subscriber privacy rights by restricting certain commercial solicitation and advertising uses of the telephone and related telecommunications equipment." H.R. Rep. No. 102-317, at 5 (1991). The Supreme Court has confirmed that "abuses of telephone technology" were what "prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 556 U.S. 368, 371 (2012). To hold that a statute meant to protect the privacy rights of consumers does not cover one of the main ways in which those rights are increasingly intruded upon would distort this clear intention.

*also Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning . . .").

Nothing in the statute indicates that Congress intended for the terms to be understood differently. In fact, "the statute's text and context suggest that [Section] 227(c), if anything, was intended to reach *broader* telephonic communications than" Section 227(b). *BMC*, 811 F. Supp. 3d at 640 (emphasis added). While Section 227(b) specifically focuses on and prohibits the use of ATDSs, Section 227(c) is entitled "Protection of subscriber privacy rights" and its text is thus "addressed broadly to the harms experienced by telephone subscribers, rather than to the forms of technology used to inflict such harms." *Id.* Since Section 227(b) has been clearly interpreted to include text messages, and Section 227(c) aims to address a broader harm, the court finds the statutory context further demonstrates that the Texts are included under Section 227(c)'s ambit.

It is true, as Defendants point out, that other sections of the TCPA have been amended explicitly to make a distinction between "a call made using a voice service" and a "text message sent using a text messaging service." 47 U.S.C. § 227(e)(8)(A)-(B). But "the 2018 Amendments [to the TCPA that introduced this distinction] were the result of legislation targeting a completely different problem": spoofing, or when a "phone call recipient[ is] tricked into answering the phone due to inaccurate caller ID information" so a "[c]riminal[]" can "steal" their money. *Easy Spirit*, 2026 WL 884170, at *7. They were not a "wide-ranging revision of the TCPA." *Id.* The 2018 Amendments' distinct goal suggests that "Congress did not have the DNC registry or the private right of action in view when it amended the statute." *Id.* In fact, the "legislative history of the 2018 Amendments contains no evidence that Congress discussed the impact of the proposed Amendments on § 227(c)(5) or considered the private right of action at all." *Id.* at *8. This use of alternative language elsewhere is not a case of legislation by silence. Defendants' arguments to the contrary are unconvincing.

3. FCC Interpretation

The FCC's interpretation of the TCPA is not binding on the court following the Supreme Court's ruling in *Loper Bright*. *See Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 311 (E.D.N.Y. 2025) ("[A]fter *Loper Bright*, it is the province of the courts—not the [agency]—to authoritatively interpret the" statute.) However, in *Loper Bright*, the Supreme Court also instructed courts to "use every tool at their disposal to determine the best reading of the statute and resolve . . . ambiguity." 603 U.S. at 400. And in *McLaughlin*, the Court confirmed in the context of FCC regulations implementing the TPCA, that courts must afford "appropriate respect to the agency's interpretation." 606 U.S. at 155. It follows then, that after *Loper Bright* and *McLaughlin*, one of the court's remaining "tools" of statutory interpretation is the "interpretations of those responsible for implementing particular statutes," because their readings "constitute a body of experience and informed judgment to which courts . . . may properly resort for guidance consistent with the APA." *Loper Bright*, 603 U.S. at 394.

The FCC has "long recognized that the TCPA's protections extend to technologies that did not exist when it was enacted," and has consistently "issued regulations and guidance interpreting [Section] 227(c) to cover text messages." *BMC*, 811 F. Supp. 3d at 641. It began this recognition in relation to Section 227(b). *See In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 (2003) ("affirm[ing] that under the TCPA, it is unlawful to make any call using an automatic telephone dialing system . . . [and that t]his encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls"). This interpretation was further strengthened and broadened in 2015, when a party "raise[d] the issue of whether SMS text messages are subject to the same consumer protections under the TCPA as voice calls," and the FCC "reiterate[d] that they are," without limiting this declaration to a particular section. *In the Matter of Rules & Reguls.*

*Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 8016 (2015). And, in "January 2024, it issued a final rule codifying that the . . . protections under [Section] 227(c) 'extend to text messages.'" *BMC*, 811 F. Supp. 3d at 641-42 (quoting *Targeting and Eliminating Unlawful Text Messages, Implementation of the Tel. Consumer Prot. Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 Fed. Reg. 5098, 5098-99, 5101 (Jan. 26, 2024)). The court finds that this consistent interpretation from the agency with the relevant "experience" and responsibility for implementing the statute lends support to its independent finding that "telephone calls" includes text messages under Section 227(c). *See Loper Bright*, 603 U.S. at 394.

4. Out-of-Circuit Case Law

As demonstrated in *BMC* and in Section III.A.2., *supra*, binding and in-circuit case law supports the finding that "telephone calls" includes texts. In addition, "while the decisions of other district courts . . . are not binding on this court, they often provide sources of persuasive reasoning." *Volin v. Civ. Ct. of City of New York*, No. 91 Civ. 339 (KMW), 1992 WL 295968, at *2 (S.D.N.Y. Oct. 2, 1992). In this context, "[d]istrict court decisions have largely held that [Section] 227(c) applies to text messages." *BMC*, 811 F. Supp. 3d at 642 (collecting nine cases holding as much, all of which "turned on statutory construction, not agency deference, and thus are not called into question by *Loper Bright*").

Defendants point to other out-of-circuit cases that are both in the minority and logically unpersuasive to the court. First, Ember and gr0 point to *Jones v. Blackstone Medical Services, LLC*, 792 F. Supp. 3d 894 (C.D. Ill. 2025), *aff'd sub nom. Steidinger v. Blackstone Med. Servs.*, 182 F.4th 532 (7th Cir. 2026) and *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270 (N.D. Fla. 2025). (*See* Ember Mot. at 7-10; gr0 Mot. at 11.) However, the courts in those cases determined that the term "telephone call" could not include text messages based on plain meaning because text messaging had not yet been invented. *See Jones*, 792 F. Supp. at 899; *Davis*,

797 F. Supp. at 1273. As explained above, the court does not find this reasoning persuasive, and also disagrees that interpreting a "telephone call" to include text messages would produce a result inconsistent with the policies underlying the statute, as Ember argues *Davis* holds. (Ember Mot. at 10.) Second, Ember and gr0 point to *Sayed v. Naturopathica Holistic Health, Inc.*, No. 8:25-CV-00846-SDM-CPT, 2025 WL 2997759 (M.D. Fla. Oct. 24, 2025) for the point that "[w]hen Congress uses different terms, court should expect that they hold different meanings," so "the fact that the term 'text message' appears elsewhere in the TCPA" means it cannot be covered by the term "telephone call." (Ember Mot. at 11; *see also* gr0 Mot. at 8.) Again, the court has addressed this point above and finds it unpersuasive.

### B. Ember's Additional Arguments

Ember advances four additional arguments in support of its motion to dismiss. (Ember Mot. at 14-20.) Specifically, Ember argues that the Amended Complaint fails to state a claim because it does not sufficiently allege that: (1) the 1501 Number was a "residential telephone" for purposes of Regulation 64.1200(c)(2), (*id.* at 14); (2) the Texts were "solicitations" for purposes of Regulations 64.1200(c)(2), (*id.* at 20); (3) Ember violated the DNC List requirements in Regulation 64.1200(d), (*id.* at 22-24); or (4) Ember can be held directly or vicariously liable for gr0's actions, (*id.* at 17). The court addresses each argument in turn.

#### 1. "Residential" Telephone

Ember argues that Plaintiff cannot bring suit under Section 227(c)(5) because Regulations 64.1200(c)(2) and 64.1200(d) apply only to "residential telephone[s]," 47 C.F.R. § 64.1200(c)(2), (d), and—according to Ember—the 1501 Number is not sufficiently alleged to be residential in nature or used for residential purposes.

Plaintiff argues that the 1501 Number is residential and that he has sufficiently alleged as much, because he alleges in the complaint that he uses the number for "personal and residential [and not] business purposes" and because he registered the 1501 Number on the DNC List. (Pl.'s Opp. at 12 (citing Am. Compl. ¶¶ 32-33).) Ember responds that Plaintiff does not cite any "binding authority" and wrongfully "dismisse[s] the applicability of . . . a comparable Eastern District case," *Gillam v. Reliance First Cap., LLC*, No. 21-CV-4774(JMA)(JMW), 2023 WL 2163775 (E.D.N.Y. Feb. 22, 2023). (Ember Reply at 6.)

Again, since the term "residential subscriber" is not defined in the statute, the court must undertake an independent analysis under *McLaughlin* and *Loper Bright* to determine if the 1501 Number qualifies as a "residential subscriber" number such that the Regulations apply. The court finds that it does.

*a. Plain Language and Statutory Context*

Regulations 64.1200(c)(2) and (d)(3) apply only to calls placed to "residential telephone subscriber[s]." 47 C.F.R. §§ 64.1200(c)(2), (d). Again, looking to a contemporaneous dictionary from the time of the TCPA's enactment, Webster's Ninth New Collegiate Dictionary defines "residential" as "used as a residence or by residents . . . [or] of or relating to residence or residences." Webster's Ninth New Collegiate Dictionary 1003 (1990). It defines a "residence" as "the place where one actually lives." *Id.*

Here, Plaintiff's allegations fit the definition clearly. He alleges that "[a]t all relevant times, [he] used the 1501 Number for personal and residential purposes and does not use the 1501 Number for business purposes." (Am. Compl. ¶ 33.) In other

words, the 1501 Number is used "by [a] resident" in a way "relating to [his] residence."[8] Courts, including the *Gillam* court, intimate that there is no need for extensive detail at this stage. *See Easy Spirit*, 2026 WL 884170, at *4; *Gillam*, 2023 WL 2163775, at *4. Plaintiff, therefore, sufficiently alleges that the 1501 Number relates to his residence.

The sufficiency of Plaintiff's allegations comes into further clarity when analyzed in context. Congress "used the term 'residential' in the broader sense of 'relating to a resident' to distinguish such a subscriber from a business or commercial telephone subscriber." *Cacho*, 739 F. Supp. 3d at 206. Again, Plaintiff explicitly alleges that he "does not use the 1501 Number for business purposes," thus indicating he has sufficiently alleged the residential nature of the 1501 Number. (Am. Compl. ¶ 33); *accord Cacho*, 739 F. Supp. 3d at 208 (finding that plaintiff had sufficiently alleged residential nature for purposes of a motion to dismiss by alleging that his cell phone was "not primarily used for any business purpose").

---

[8] Ember brings the court's attention to the fact that "Plaintiff alleges that most courts around the country have determined that cell phones are entitled to TCPA protection as residential telephones," but it does not posit any persuasive reasons why it disagrees with this interpretation. (Ember Reply at 6-7.) The court finds that it "is perfectly consonant with the statute that residential subscriber would be read to include those individuals who use a cellphone for household purposes" and thus that the "residential" requirement does not present a bar to Plaintiff's claim. *Cacho*, 739 F. Supp. 3d at 207. Further, that the term "cellular telephone" is used in Section 227(b) and not Section 227(c) is of no moment, considering that its use there is in describing types of telephone systems that may not be contacted by ATDSs, 47 U.S.C. § 227(b)(1), (2), which has no bearing on whether the term "residential subscriber" includes those who use a cellular telephone. The parallels that exist between the two sections when determining the meaning of the term "telephone call" do not exist here. *Cacho*, 739 F. Supp. 3d at 204-05.

*b. The DNC List*

Admittedly, Plaintiff's allegations discussed above regarding the residential nature of the 1501 Number are not the "model of specificity." *Showers v. Pelican Inv. Holdings Grp., LLC*, 751 F. Supp. 3d 900, 910 (S.D. Ill. 2024). However, the court "finds them sufficient to state a plausible claim for relief under the TCPA," for two reasons. *Id.* First, as explained above, the specificity of the facts alleged aligns with that required to be pleaded at this point. *See Gillam*, 2023 WL 2163775, at *4.

Second, Plaintiff also alleges that he placed the 1501 Number on the DNC List in 2021, leading to a "presumption" that he is a residential subscriber. (Am. Compl. ¶ 32); *see Cacho*, 739 F. Supp. 3d at 202-03. Both the FCC[9] and courts within the Second Circuit have indicated that signing up for the DNC List lends a presumption that the subscriber is a "residential subscriber." The FCC explicitly "presumes wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'" *Cacho*, 739 F. Supp. 3d at 202 (quoting *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14039 (2003)). *Cacho* follows this presumption, and notes that "[n]umerous [other] courts have applied the presumption . . . and held that an individual who registers her cellphone with the Do Not Call Registry is a residential telephone subscriber." *Id.* at 203, 203 n.4 (collecting cases). Similarly, *Rose v. New TSI Holdings, Inc.*, No. 21-CV-5519 (JPO), 2022 WL 912967, at *2 (S.D.N.Y. Mar. 28, 2022) found allegations that a number had "been listed on the DNC Registry since 2004" "sufficient for [the] TCPA claims to move forward" because the court followed the presumption that "wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'" This presumption is logical, too—a business ostensibly has a phone

[9] Again, "after *Loper Bright*, it is the province of the courts—not the [agency]—to authoritatively interpret the" statute. *Rodriguez-Acurio*, 811 F. Supp. 3d at 311. But the court can still afford "appropriate respect to the agency's interpretation." *McLaughlin*, 606 U.S. at 155.

number *so that* it can receive and field calls from potential or existing customers, whereas residential subscribers are more likely to want to "avoid intrusions from unwanted calls" and thus place their number on the DNC List. *Cacho*, 739 F. Supp. 3d at 208.

Last, Plaintiff's placing of the 1501 Number on the DNC List and the entailing residential presumption indicate that Ember's reliance on *Gillam* is misplaced. While it is true that the court in *Gillam* found allegations that the phone at issue there was not "associated with a business . . . and is primarily for personal use" were "conclusory," the court there did not adequately consider the presumed residential nature of the phone because the Plaintiff had "registered his cell phone number on the National Do Not Call . . . registry" years earlier. *Gillam*, 2023 WL 2163775, at *1, *4. Given the overwhelming case law indicating that allegations similar to Plaintiff's—including placing one's phone number on the DNC List—are sufficient, the court is not persuaded that Plaintiff's allegations are conclusory, and instead finds that Plaintiff sufficiently pleads that the 1501 Number was residential.

2. "Solicitations"

Ember next argues that the Texts were not "solicitations" such that the prohibitions under Regulation 64.1200(c)(2), which apply only to "telephone solicitations," do not apply. It asserts two reasons as to why this is the case. First, it argues that Plaintiff must have subscribed to the Texts at one point, because the Texts told Plaintiff he was "unsubscribed" and thanked him "for signing up." (Ember Mot. at 21.) They argue this indicates Plaintiff had given "prior express invitation or permission" and thus that the Texts do not fall under the Regulation's definition of solicitation. *Id.* Second, it argues that the messages "merely encouraged Plaintiff to save the Ember contact card and encouraged visiting the website," and thus were not actually "soliciting" Plaintiff to buy anything. (*Id.* at 22.)

Plaintiff responds that: (1) even if Plaintiff had previously consented to the Texts, he revoked any such consent by messaging "Stop" and signing up for the DNC List; (2) the Texts were solicitations because they "encourage[d] the purchase [of] . . . goods" by inviting Plaintiff to "[s]hop now." (Pl.'s Opp. 19-20.) Ember replies that, in any event, not all of the Texts could be solicitations because some "do not contain a link to the Ember website." (Ember Reply at 8.) The court addresses the arguments in reverse order, as the first implicates a statutory exception to the general rule laid out below.

Again, Regulation 64.100(c)(2) forbids "telephone solicitations" to subscribers who have put themselves on the DNC List. 47 C.F.R. § 64.1200(c)(2). The term "solicitation" is defined in the TCPA at 47 C.F.R. § 64.1200(f)(15) ("Regulation 64.1200(f)(15)") as:

> the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message:
>
> **(i)** To any person with that person's prior express invitation or permission;
>
> **(ii)** To any person with whom the caller has an established business relationship; or
>
> **(iii)** By or on behalf of a tax-exempt nonprofit organization.

47 C.F.R. § 64.1200(f)(15). "TCPA claims [under this section] rest on a common contention: that the [Texts] Plaintiff received were made 'for the purpose of encouraging the purchase'" of

goods. *Cacho*, 739 F. Supp. 3d at 209 (quoting 47 C.F.R. §§ 64.1200(f)(13), (15)).

*a. The Texts were Solicitations*

This definition is amply satisfied. Regulation 64.1200(f)(15) essentially indicates that a communication that encourages the recipient to buy a product is a solicitation. A plain reading of the Texts indicates that they did exactly that when they urged Plaintiff to shop for Ember's merchandise. Ember is correct that the Texts "encouraged Plaintiff to save the Ember contact card and encouraged visiting the website." (Ember Mot. at 22.) But they went further than that, and actively encouraged the purchase of Ember's goods. They explicitly provided Plaintiff with two discounts, and told him to "[s]hop now" and not to "miss out" on using those discounts. (Am. Compl. ¶¶ 34-35.) Evidently, the goal of the Texts was more than just to get Plaintiff through the metaphorical door. They specifically entreated him to "[s]hop," (*id.*), and thus were clearly "encouraging the purchase [of] . . . goods," 47 C.F.R. § 64.1200(f)(15).

Ember suggests that the Texts were simply "urging a consumer to visit a website [and thus] are too attenuated to constitute urging a sale." (Ember Mot. at 22 (citing *Suttles v. Facebook, Inc.*, 461 F. Supp. 3d 479 (W.D. Tex. 2020).) But the difference between this case and the out-of-circuit cases Ember cites to support that argument is clear. In those cases, the "messages were not [found to be] telephone solicitations under the act" because '"the consumer [was simply] directed to a social-media website offering services for sale."' (Ember Mot. at 22 (quoting *Suttles*, 461 F. Supp. 3d at 483 (citing *Suriano v. French Riviera Health Spa, Inc.*, No. CV 18-9141, 2018 WL 6702749, at *3 (E.D. La. 2018))).)

Here, on the other hand, Ember was directing Plaintiff to its own online shop. *Cf. Cacho*, 739 F. Supp. 3d at 209 ("Courts have proven skeptical of arguments that TCPA liability attaches to calls that encourage the recipient to use services that are purchased and paid for by a third party."). Ember also exhorted Plaintiff to "[s]hop now" for its own goods once he was on its website. (Am. Compl. ¶¶ 34-35.) This call to action takes the Texts out of the realm of an invitation to visit a social media site and into the realm of a telephone solicitation. *See also Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). (finding it "common sense" that a robocall from Best Buy that urged the recipient to "'redeem' his Reward Zone Points, directed him to a website where he could further engage with the [points], and thanked him for 'shopping at Best Buy'" had "encouraged the listener to make future purchases at Best Buy," even though there was no "explicit mention of a good, product, or service," because "the implication [was] clear from the context.")

Ember also argues that all of the Texts "are lumped together as solicitations," even though some of them did not contain any "link" or call to action. (Ember Reply at 8.) But the Texts without links were sent within an hour of messages explicitly telling Plaintiff to "[s]hop now," so to "lump" them together is to understand the reality of how the texts, in tandem, would be perceived. (Am. Compl. ¶¶ 34-35.) As for the Texts sending Ember's contact card, the next message says it was sent so that Plaintiff would be aware of Ember's "latest deals" and thus was also meant to encourage him to shop even if they did not link to a website. (*Id.*) Further, the Agreement stated that the purpose of the Texts as a whole was to convert those who received them into "repeat customers." (Am. Compl. ¶ 24.) And the fact that a party "would have received [some]thing from" the recipient indicates that that party sent the message to "encourage[ the recipient] to purchase . . . [goods]." *Rockwell v. Medicus Healthcare Sols., LLC*, No. 24-

CV-128-LJV, 2025 WL 959745, at *5 (W.D.N.Y. Mar. 31, 2025). Plaintiff "[s]hop[ping]" on the website Ember sent to Plaintiff would mean that Ember would receive something from Plaintiff (*i.e.*, the money he would have paid for the good), further indicating encouragement. (Am. Compl. ¶¶ 34-35).

*b. The Exception Does Not Apply*

Ember also argues that Plaintiff must have at some time consented to the Texts because the language of the Texts said that Plaintiff had "unsubscribed," such that the exception outlined in Regulation (f)(15)(i) applies. (Am. Compl. ¶¶ 34-35.) First, as addressed in Section III.B.4, *infra*, the court notes the fact that Ember had control of the content of the Texts and thus could use any language with whatever connotation it wanted. (*See* Am. Compl. ¶ 26.) But, in any event, the court must draw all reasonable inferences in Plaintiff's favor, and Ember (without citing any supporting authority) asks the court to do the opposite: to "'infer[ from this fact]' that Plaintiff 'at one point in time' signed up for messages." (Pl.'s Opp. at 20 (quoting Ember Mot. at 21).) The only allegation actually pleaded to the court is that Plaintiff told Ember to "[s]top" sending him messages, and this is thus the only allegation the court considers. (Am. Compl. at ¶¶ 34-35.) And the court finds that this Text suffices to allege that Plaintiff "d[id] not wish to receive telephone solicitations" from Ember. 47 C.F.R. § 64.1200(c)(2). Whether Plaintiff had consented at some previous time is a question of fact that can be resolved at a later point in the proceedings; for now, the allegations are sufficient.

3. The DNC List

Ember argues that the Complaint should be dismissed because it did, in fact, maintain an internal DNC List, as is required under Regulation 64.1200(d)(3), and that it honored Plaintiff's request

to be put on it. First, it argues that there is internal correspondence between Defendants that indicates that Ember had instituted procedures for maintaining such a list, which it says the court can consider because there is no clear dispute as to the document's authenticity. (Ember Mot. at 24.) Ember also argues that the allegations do not suffice to allege that it did not honor Plaintiff's opt-out request "within a reasonable period" as required by Regulation 64.1200(d)(3). (*Id.*)

Plaintiff responds that the fact that "the messages continued" after he "instructed Defendant to stop sending them" means "'it is reasonable to infer that [Ember] did not have [the] internal procedures'" required. (Pl.'s Opp. at 20 (quoting *Eagle v. GVG Cap., LLC*, No. 22-CV-00638-SRB, 2023 WL 1415615, at *4 (W.D. Mo. Jan. 31, 2023).) Plaintiff also responds that he has sufficiently alleged that his opt-out request was not honored within a reasonable period because the Texts indicate the period here between the "Stop" Text and the second batch of Texts was "more than one year." (*Id.* at 21.) Ember again points to its external documentary evidence as support in reply.

Regulation 64.1200(d)(3) states that

> "No person or entity shall initiate any . . . telemarketing [call] to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls. . . . If a person or entity making [such a] call for telemarketing purposes . . . receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made [and] must honor [the] . . . request

> within a reasonable time from the date such request is made. This period may not exceed ten (10) business days from the receipt of such request."

47 C.F.R. § 64.1200(d)(3). "For a TCPA claim under 47 C.F.R. § 64.1200(d) to survive a motion to dismiss, 'a plaintiff must show that the entity placing the calls failed to institute the proper procedures *prior* to the initiation of the call,' or that there was a "failure to comply with a DNC request to not be called within a reasonable time, despite having procedures in place." *Barr v. Macys.com, LLC*, No. 1:22-CV-07867 (ALC), 2023 WL 6393480, at *4-*5 (S.D.N.Y. Sept. 29, 2023).

First, the court clarifies that will not consider the extrinsic evidence to which Ember points in support of its argument. A district court "is normally required to look only to the allegations on the face of the complaint." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). While the court "*may* consider documents that are attached to the complaint," integral to it, or incorporated by reference, it need not do so. *Id.* (emphasis added). Here, the documents Ember quotes are not attached to the complaint or incorporated therein—though Ember does cite them in its Motion to Dismiss. (*See* Ember Mot. at 24.) Nor are they integral to the complaint.

Looking to the allegations in the Complaint, the court finds that Plaintiff has sufficiently alleged a violation of Regulation 64.1200(d), because of the timing of the Texts he lays out. Regulation 64.1200(d)(3) not only requires the existence of an internal list, but also that the creator of the list "honor [the] residential subscriber's do-not-call request within a reasonable time from the date such request is made," not exceeding 10 business days. 47 C.F.R. § 64.1200(d)(3). Under this rule, "defendants will be held liable for failure to comply with a DNC request to not be called within a reasonable time, despite having procedures in place." *Barr*, 2023 WL 6393480, at *5. Here, the second batch of

Texts were sent over a year after Plaintiff sent his "Stop" Text, which was clearly asking to opt out of messages and thus ostensibly to be added to Ember's internal DNC List.[10] Even assuming that Ember's contentions and quotes in its Motion to Dismiss indicate that it *did* maintain a list, its continuing to send the Texts more than a year after Plaintiff asked it to stop signifies that it did not comply with Regulation 24.1200(d)(3).

4. Vicarious Liability

Last, Ember seeks dismissal because it argues that it cannot be held directly or vicariously liable for the violation of Section 227(c)(5). As for direct liability, it argues that the Texts were sent by gr0, not Ember, and thus it is not directly liable for whatever resultant violations of the TCPA there may have been. (*See* Ember Mot. at 17.) As for vicarious liability, while Ember recognizes that it *could* be held liable under a theory of vicarious liability based on the Supreme Court's ruling in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), it argues that Plaintiff has not established actual authority, apparent authority, or ratification—the three "common law . . . agency relationship[s]" that lead to vicarious liability for a principal. (*Id.* at 17-20.)

Plaintiff responds that he does sufficiently plead that Ember is liable. First, he argues that there is direct liability, because the Texts themselves say they are from Ember. (Pl.'s Opp. at 14.) Second, he argues that Ember is otherwise vicariously liable under a theory of actual authority, because the Agreement sets forth an agency relationship, regardless of the fact that the "boilerplate language" calls gr0 an independent contractor. (*Id.* at 16-17.) Ember replies that gr0 was, in fact, an independent contractor,

[10] The court is cognizant that Ember implies that the second batch of Texts were sent due to some technical error when gr0 "implemented a new SMS platform" that "resulted in the SMS messages in question being sent." (Ember Mot. at 3.) "But civil liability exists even in the case of an innocent mistake." *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 716 n.7 (1980) (Blackmun, J., concurring in part and dissenting in part).

and that Plaintiff "fails to address any of the elements required for actual and apparent authority." (Ember Reply at 7.)

Under the TCPA, a "plaintiff must allege either (1) direct liability (*i.e.*, that the defendant [sent the message]) or (2) vicarious liability (*i.e.*, that the defendant has an agency relationship with the third-party that [did so])." *Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 282 (S.D.N.Y. 2024). "Plaintiffs seeking to hold companies vicariously liable for the TCPA violations of third parties can show either that (1) there was a principal-agent relationship between them, (2) the third party acted with apparent authority or (3) the company ratified the conduct of the third party." *Jenkins v. Nat'l Grid USA*, No. 15-CV-1219(JS)(GRB), 2017 WL 1208445, at *7 (E.D.N.Y. Mar. 31, 2017).

A party is liable "under a theory of actual authority when there exists an explicit agency relationship." *Hale v. Teledoc Health, Inc.*, No. 20 CV 5245 (VB), 2021 WL 1163925, at *3 (S.D.N.Y. Mar. 25, 2021), *judgment entered*, 2021 WL 1168079 (S.D.N.Y. Mar. 25, 2021). That relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent to or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (A.L.I. 2024). Interim control—that is, the "power to give interim instructions"—"distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Hale*, 2021 WL 1163925, at *3 (quoting *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 278 (2d Cir. 2013)). A principal "must exercise control over the conduct or activities of the agent" to be liable for an agent's acts. *Id.* To adequately allege this actual agency relationship, a "plaintiff need only allege facts sufficient to support a reasonable inference of actual authority, and its pleadings may rely upon facts that would constitute circumstantial evidence of authority." *Id.* (quoting *Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012)).

Plaintiff has not adequately alleged direct authority; while it is true that the messages said they were from Ember, "that general statement is contrary to the Complaint's more specific allegations that" Ember hired gr0 to "initiate calls on its behalf, but . . . did not place those calls directly." *Cacho*, 739 F. Supp. 3d at 213-14. For direct liability, "Plaintiff [would have to have] pleaded that [Ember] actually, physically initiated the telephone calls at issue," but he does not do so. *Id.* at 214.

That said, Plaintiff does adequately allege vicarious liability under a theory of actual authority. The Agreement makes clear that Ember "manifest[ed] assent to [gr0] that [gr0] shall act on [Ember's] behalf and subject to [its] control, and [gr0] manifest[ed] assent . . . so to act." Restatement (Third) of Agency § 1.01 (A.L.I. 2024). The Agreement states that gr0 would "unlock revenue for [Ember] by building out the below email/sms [sic] campaign" and "deliver an email and sms [sic] marketing strategy . . . with approval from Ember." (Agreement at 8.) The Agreement was signed by representatives of both gr0 and Ember. (*See id.* at 29.)

Moreover, Plaintiff points to many examples in the Agreement that indicate the power of interim control; that is, that Ember agreed to have gr0 act on its behalf and had the power to give gr0 instructions. Ember was to be "given a reasonable opportunity to review and approve the Deliverables while they [were] in development," had the power to "notif[y gr0] in writing that it d[id] not approve of [a] Deliverable" and make "[s]ubsequent change requests," and it "assume[d] full and sole responsibility for ensuring that each Deliverable's (a) content, and (b) use by Ember . . . [we]re at all times in compliance with all applicable laws and regulations and d[id] not violate the right of any third parties." (Am. Compl. ¶¶ 26-27; Agreement at 20.) This relationship gave Ember a clear right of interim control. It was able to review gr0's work and veto it, and assumed responsibility for its impact—even if it could not control the specific times "when gr0 . . . sen[t] Email/SMS communications." (Ember Mot. at 3.) The

allegations here align closely with those in *Carrodine v. Flatiron Media, LLC*, No. 22-CV-9660 (JMF), 2023 WL 8187851, at *1 (S.D.N.Y. Nov. 27, 2023), where the court found that allegations of a contract between parties where the principal could "control the marketing activities" of the agent and "ha[d] control over the text and the ability to pre-approve the copy," and the texts the agent sent "led to [the principal's] website" were sufficient. The same is true here; Ember and gr0 had the Agreement, which Plaintiff alleges gave Ember the ability to approve the Texts, and the Texts led to Ember's website.

This conclusion is not changed by the language in the Agreement stating that gr0 "is an independent contractor for Ember Technologies, Inc., and nothing in this Agreement shall be construed as creating an employer-employee relationship, a partnership, agency relationship, or a joint venture between the parties." (Ember Mot. at 3.) When the rights of third parties are involved, the "relationship between contracting parties must be determined by its real character rather than the form and color that the parties have given it. . . . An [agent] does not become an independent contractor simply because a contract describes him as such." *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984); *see also W. Energy Opportunities II, LLC v. Finalis Sec., LLC*, No. 24-CV-2565 (ER), 2025 WL 935201, at *9 (S.D.N.Y. Mar. 26, 2025), *reconsideration denied*, No. 24-CV-2565 (ER), 2025 WL 2370930 (S.D.N.Y. Aug. 14, 2025) (Even if a party was an independent contractor, the "two terms are not mutually exclusive; an independent contractor may also be an agent."). Plaintiff's allegations indicate that this "real character" was one of actual authority, not one of independent contract work. Whether an agency relationship actually existed is a question of fact that must be determined at a later point, but the court notes that Ember cannot shield itself from agency liability simply by adding a clause in the contract that says there is no agency relationship. To allow a defendant to do so would essentially allow that defendant to avoid all vicarious liability regardless of the circumstances. As this point, Plaintiff has sufficiently pleaded that the relationship was one of agency.

## IV. CONCLUSION

For the reasons stated above, the court DENIES Defendants' Rule 12(b)(6) motions to dismiss the Amended Complaint. The parties are DIRECTED to proceed to discovery under the supervision of Magistrate Judge Peggy Cross-Goldenberg.

SO ORDERED.

Dated: Brooklyn, New York
October 26, 2026

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge